FILED
United States Court of Appeals
Tenth Circuit

October 3, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ELIZABETH FREDERICK,

      Plaintiff-Appellant,

v.

METROPOLITAN STATE
UNIVERSITY OF DENVER BOARD
OF TRUSTEES,

      Defendant-Appellee.

No. 12-1505
(D.C. No. 1:10-CV-03163-RPM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

Elizabeth Frederick appeals from the district court's grant of summary

judgment in favor of Metropolitan State University of Denver Board of Trustees

(Metro) on her claim that she was denied a promotion on the basis of her gender in

violation of 42 U.S.C. § 2000e, *et seq.*, commonly known as Title VII of the Civil

Rights Act of 1964. We have jurisdiction under 28 U.S.C. § 1291, and affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.    BACKGROUND

A.  *The Promotion Process*

Elizabeth Frederick, Ph.D., is a tenured associate professor at Metro.  She works in the Management Department, which in turn is part of the School of Business.  There are three tenure or tenure-track ranks for professors at Metro: assistant professor, associate professor, and professor.  The promotion process is governed by the Handbook for Professional Personnel (the Handbook).  Associate professors are eligible for promotion to professor after four years of service.  Metro hired Dr. Frederick in 1987 as a tenure-track assistant professor.  She was granted tenure and promoted to associate professor in 1992.

Although she was eligible to apply for promotion to professor in 1996, Dr. Frederick waited for ten years – until 2006 – to first apply.  According to Dr. Frederick she "had other things [she] was busy with," Aplt. App. at 570, and "[g]etting promoted wasn't that important," *id*. at 621.  She decided to pursue the promotion in 2006 following a stint as the Department Chair,[1] which convinced her that she did not have a future in administration and inspired her "to become the best teacher/researcher [she] could be."  *Id*. at 570.  "[T]he other main reason . . . [was] because it made a difference finally in terms of salary."  *Id*.

---

[1]    Dr. Frederick was the Chair of the Management Department in 2004 when John P. Cochran was appointed interim Dean of the School of Business.  An alleged adversarial relationship developed between Dr. Frederick and Dean Cochran and Dr. Frederick was persuaded to resign.

A faculty member who seeks promotion is required to submit a comprehensive dossier with information sufficient to permit an evaluation of his or her performance. "The four performance areas for evaluating faculty for . . . promotion . . . are teaching, advising, professional development, and service." *Id.* at 81. Among other things, the dossier must include: "[a] current academic vita . . . [;] [e]vidence of contribution to teaching and advising; evidence of professional development accomplishments and service contributions[;] [and] [a]ll student evaluation and peer observation results." *Id.* at 78-79.

The dossier moves through seven levels of review: (1) the faculty member's Department Committee, which consists of tenured faculty in the given Department, except the Department Chair and any faculty members who serve on the School Committee or Faculty Senate; (2) the Department Chair; (3) the School Committee, which represents the range of disciplines and is comprised one half each of members elected by the faculty and appointed by the Dean; (4) the School Dean; (5) the Faculty Senate Committee, which is comprised of tenured faculty and established by senate bylaws; (6) the Provost/Vice President of Academic Affairs; and (7) the President. Each level considers the dossier and makes a recommendation for or against promotion. The Handbook does not explicitly require written comments, however, it is common practice to provide an explanation for the recommendation. The ultimate decision regarding promotion rests with the President.

John P. Cochran, Ph.D., became the interim Dean of the School of Business in 2004. He was permanently hired in 2006 and served in this capacity until his retirement in 2011. When Dr. Cochran became Dean, "five of the six [business] departments had guidelines that [he] thought required accurate rigor and strategic goals for the School of Business." *Id*. at 151-52. But in his "view, the guidelines for the Management Department were low." *Id*. 152. Of particular concern to Dean Cochran was the fact that the School of Business was actively pursuing accreditation by the Association to Advance Collegiate Schools of Business (AACSB), and the "high standards" to obtain accreditation meant that "every department in the School of Business had to place a high priority in the development of a consistent stream of intellectual contributions that result in peer-reviewed full paper presentations with refereed journal articles, book chapters, and/or scholarly books or textbooks most highly valued." *Id*. As one professor in the Management Department explained, "[w]hen the School of Business voted to seek AACSB accreditation, we knew the guidelines for each department would be revised to reflect the heightened standards required for accreditation, particularly in the area of scholarly activity." *Id*. at 1320. The changes, however, were neither "drastic[], nor did they come as a surprise." *Id*. at 1321.

### B. Dr. Frederick's First Application

Although Metro's denial of Dr. Frederick's 2007 application forms the basis of her claim, her first application in 2006 sets the stage. In addition to her dossier and

curriculum vitae, Dr. Frederick submitted the Management Department Guidelines that were in effect in 2004 and 2005, despite the fact that the Guidelines had changed by the time that her materials were submitted in 2006.

The first two levels of review (the Department Committee and Department Chair) recommended promotion. However, the remaining five levels of review did not. At level three, the School Committee observed that the lack of professional development (the gap in publishing from 1984 to 2006) outweighed the positive. At level four, Dean Cochran wrote: "I must concur with the school committee 6-0 vote **against** promotion . . . for the reason stated, the 'body of work over her career is lacking a performance level commensurate with the rank of professor.'" *Id*. at 149. At level five, the Faculty Senate Committee also did not recommend the promotion. In particular, the Committee was aware "that the School of Business was seeking accreditation and the department's guidelines reflected the requirements for professional development. Although Dr. Frederick was Department Chair during a portion of the timeframe under review, her service . . . did not limit or change the criteria for promotion to Professor." *Id*. at 160. Finally, neither the Provost nor the President recommended promotion.

### C. *Dr. Frederick's Second Application*

Dr. Frederick applied for promotion the next year. This time she included two sets of Management Department Guidelines: those in effect in 2004-2005 and those that took effect in 2006. Between her first and second applications and with regard to

professional development, Dr. Frederick neither published nor submitted for publication any papers in peer-reviewed journal articles. She did, however, make two peer-reviewed presentations, started work on some chapters of a book, and collected some "arbitration cases [that she intended to] rewrite . . . to use in [her] Labor Relations class." *Id*. at 605.

At level one, and although the vote was not unanimous, the Department Committee recommended promotion. The Department Chair at level two, however, did not. He wrote: "[Dr. Frederick's] performance in teaching and professional development are inadequate for a positive recommendation for promotion to professor. . . . I reached this conclusion based on the contents of the dossier and performance levels of other professors in the department." *Id*. at 189. The School Committee likewise did not recommend promotion. It cited Dr. Frederick's "somewhat wide teaching evaluation variation," and the lack of a "sustained record of publications." *Id*. at 190.

At level four, Dean Cochran did not recommend promotion. He wrote: "I must concur with the decision not to recommend from the school committee, the department chair (and two members of the department committee who did not recommend promotion)." *Id*. at 192. He acknowledged significant improvement "in both teaching effectiveness and professional development," and commended Dr. Frederick "for her efforts in 2006 and 2007." *Id*. Dean Cochran reminded her,

however, "that the effort must be *sustained and consistent over several years* to meet the standards and expectations for promotion." *Id*.

The Faculty Senate Committee also did not recommend promotion. It wrote: "Your dossier shows recent improvement in professional development and the Committee encourages you to continue on this track so that you may meet the level of sustained performance expected by your department chair, the dean, and the School of Business." *Id*. at 193.

At level six, Provost, Linda S. Curran, Ph.D., did not recommend promotion. She explained that her "role in reviewing dossiers was not to re-create what other levels of review had done, but [to] . . . make sure that the conclusions reached at each level were supported by the dossier." *Id*. at 200. She denied speaking with Dean Cochran or relying solely or even primarily on his comments or those of any other individual or group. Instead, she "considered the dossier and the comments of the various levels of review, as a whole." *Id*. at 204.

> There were two things at play. . . . [O]ne, [Dr. Frederick] appeared not to be undertaking substantive new intellectual activities, and two, there was no substantive follow-through evident for those efforts she had initiated, some of them first begun years earlier. I looked for evidence that she had submitted some of her previous work for peer review, that had not yet been published, but there was no such evidence. There appeared to me to be a flurry of recent activity to get above what she perceived to be the bar for promotion. It appeared that she had a serious misperception of those requirements.

*Id*. at 200-01. Provost Curran observed that in light of the process for AACSB accreditation, "the School of Business had to emphasize the professional

- 7 -

development of its faculty[,] [and] [a]s a result, all of the departments within the School of Business revised their department guidelines to incorporate this goal and focus more specifically on the publication of scholarly papers in peer-reviewed journals." *Id.* at 201. To her mind, Dr. Frederick did not meet the guidelines. More to the point, Provost Curran stated that Dr. Frederick did not meet the criterion for sustained growth as required by the Handbook, which had not been changed.

At the final level of review, the President Stephen M. Jordan, Ph.D., decided against promotion. He addressed several reasons for the decision in an affidavit. First, he explained that "Dr. Frederick had the obligation to submit materials that met her department's current standards. . . . She may not live in the past and have her contributions 'grandfathered' under out-of-date guidelines. . . . What she submitted did not meet the standard for promotion, i.e., a demonstration of sustained growth." *Id.* at 1399-40. Second, he stated that although "Dr. Frederick's contributions were sufficient to maintain her employment[,] . . . [p]romotion requires an effort greater than merely maintaining [and] Dr. Frederick's contributions were not sufficient for promotion to [p]rofessor." *Id.* at 1400. Last, President Jordan said that he "agreed with the levels of review that did not recommend promotion but [he] did not merely 'rubber stamp' their decisions." *Id.* He "did not rely exclusively on Dean Cochran's comments – or anyone else's." *Id.* Instead, he "independently review[ed] [Dr. Frederick's] dossier and [] ma[de] [his] own assessment and decision regarding the merit of [her] application." *Id.* at 1401. In the final analysis, "[w]hat caused

- 8 -

[him] not to promote Dr. Frederick was the evidence in her dossier that she lacked sustained growth in her professional development and that she was inconsistent in her teaching evaluations. The facts were as they were." *Id*. at 1400-01.

## II.    THE DISTRICT COURT PROCEEDINGS

In response to Metro's motion for summary judgment, Dr. Frederick explained the main theory of her case as one involving an allegedly gender-biased Dean Cochran using President Jordan, the decision maker, as his dupe or "cat's paw" to deny the promotion:

> As a member of the Management Department with an expertise in human resources, organized labor and workforce diversity, Dr. Frederick has vocally championed the rights of minorities and women at [Metro]. Interim Dean, John Cochran, did not like outspoken women, and he bristled at Dr. Frederick's advocacy. After [Metro] promoted Dr. Cochran to the position of Dean of the School of Business in January[] 2004, he began to thwart employment opportunities as they arose. When Dr. Frederick went up for promotion in the fall of 2006 and again in the fall of 2007, Dr. Cochran thus devised a distorted method of looking at her performance so that others would misevaluate her, with the intent that she would not be promoted. As a direct and proximate result, Dr. Frederick was not promoted.

*Id*. at 287-88.

The district court found that there was not sufficient evidence to support a jury finding in Dr. Frederick's favor. In particular, the court rejected Dr. Frederick's argument that Dean Cochran's alleged animus affected the other levels of review: "Assuming that Dean Cochran's opposition may have influenced [the lower levels of review], there is nothing to support an inference that his opposition was a cause of the rejections by the Faculty Senate Committee, the Provost . . . and the President."

*Id.* at 1447-48.  The court also found no evidence of disparate treatment because the male faculty members Dr. Frederick used as comparators "were in different departments and their dossiers were significantly different."  *Id.* at 1448.  Finally, noting the deference accorded to decisions in academia, the court found that "[t]here is nothing to warrant a finding by a jury that the judgments made by the reviewers of [Dr. Frederick's] application for promotion were such a substantial departure from academic norms that they may be held to be pretextual."  *Id.*

## III.    THE STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Tabor v. Hilti, Inc.,* 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted).

"We review de novo the district court's decision to grant summary judgment." *Id.* (internal quotation marks omitted).  In doing so, "[w]e view the facts in the light most favorable to [Dr. Frederick] . . . and draw all reasonable inferences in [her] favor."  *Id.* (internal quotation marks omitted).  "But [Dr. Frederick] must still identify sufficient evidence requiring submission to the jury.  She cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim;

she must proffer facts such that a reasonable jury could find in her favor." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009) (citation and internal quotation marks omitted).

## IV.   ANALYSIS

### A. *The Legal Framework*

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). "[The] McDonnell Douglas . . . three-step analysis requires the plaintiff first prove a prima facie case of discrimination." *Id*. To establish a prima facie case, Dr. Frederick "must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Id*. If Dr. Frederick makes out a prima facie case, "[t]he burden then shifts to [Metro] to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id*. If Metro meets that burden, "the burden then shifts back to [Dr. Frederick] to show that [her] protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id*. We assume without deciding that Dr. Frederick made out a prima facie case and that Metro produced a legitimate,

non-discriminatory reason for denying the promotion.  As such, we turn to her two theories to establish pretext.

     *B.  "Cat's Paw"*

To survive summary judgment on a subordinate bias theory, commonly known as a "cat's paw" case, the plaintiff must establish two things: (1) "a genuine issue of material fact concerning the bias of the subordinate" and (2) "genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which . . . requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision." *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 488 (10th Cir. 2006).  As the "party opposing a properly supported motion for summary judgment [Dr. Frederick] may not rest upon the mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration and internal quotation marks omitted).

We agree with the district court that Dr. Frederick presented enough evidence to survive summary judgment as to bias.  As the court noted, there was evidence of "tensions between Dr. Frederick and Dean Cochran as reflected in a[n] [unsent] memorandum he drafted on June 9, 2004" in which he wrote that the issues she "ha[d] chosen to champion  . . . have been disruptive and counterproductive to the smooth operations of the school," Aplt. App. at 1446.  There was also evidence that Dean Cochran declined to meet with Dr. Frederick in 2004 about the findings from a

task force study in which she perceived inequities in the pay of women and minorities. Instead of taking the meeting, Dean Cochran said that anyone who felt aggrieved should raise the issue with Metro's Equal Employment Office. As thin as this evidence might be, we conclude that a reasonable jury could infer discriminatory intent.

But as to the second element, Dr. Frederick could not survive summary judgment because there was no evidence of a causal relationship between Dean Cochran's recommendation and President Jordan's decision. Most recently in *Staub v. Proctor Hospital*, ___ U.S. ___, 131 S. Ct. 1186, 1189 (2011), the Supreme Court addressed "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." The court held "that if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [antidiscrimination statutes]." *Id*. at 1194 (footnote omitted). *See Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1271 (10th Cir. 2012) (applying *Staub* to employment discrimination claim under 42 U.S.C. § 1981); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (applying *Staub* to Title VII claim).

While there was some evidence that Dean Cochran may have been in a position to influence the lower levels of review, Dr. Frederick did not produce any evidence that he was in a position to, or did influence the upper levels of review. For example, in response to Metro's motion for summary judgment, Dr. Frederick argued that "the [Faculty] Senate Committee was influenced by Dr. Cochran's false and derogatory [promotion recommendation]," Aplt. App. at 299, citing opportunities for the Dean to have communicated with the Committee, but no evidence that he did so. Further, she came forward with no facts to rebut President Jordan's affidavit, which stated that he "did not rely exclusively on Dean Cochran's comments – or anyone else's," *id*. at 1400, and "independently review[ed] [Dr. Frederick's] dossier and [] ma[de] [his] own assessment and decision regarding the merit of [her] application," *id*. at 1401. In response, Dr. Frederick mustered arguments and theories – not facts. For example, she called President Jordan's affidavit "suspect," and accused him of undertaking "only a cursory review, if any," of her dossier, and "ma[king] his determination, in whole or in part, based upon [Dean] Cochran's negative comments," *id*. at 301, but failed to submit evidence to support her arguments.

### C. Differential Treatment

A plaintiff may also show pretext "by providing evidence that [she] was treated differently from other similarly situated, nonprotected employees . . . provided the similarly situated employee shares the same supervisor, is subject to the

same performance standards, and otherwise faces comparable relevant employment circumstances." *BCI Coca-Cola*, 450 F.3d at 489 (internal quotation marks omitted). In this regard, Dr. Frederick attempted to establish pretext by a comparison to two male associate professors who were promoted to professor. According to Dr. Frederick, one faculty member had teaching evaluations that were similar to hers and the other had a similar record of professional development. Assuming for argument that Dr. Frederick and the two male faculty members were similarly situated, her argument fails.

"We will draw an inference of pretext where the facts assure us that the plaintiff is better qualified than the other candidates for the position." *Santana v. City and Cnty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (internal quotation marks omitted). Dr. Frederick's opinion aside, there is no evidence to assure us that she was as qualified, let alone better qualified than the others. We are also mindful that "it is not our role to act as a super personnel department that second guesses employers' business judgments." *Id*. (internal quotation marks omitted).

Just as important, we "assess[] pretext by examining the facts as they appear to the person making the decision." *Id*. (internal quotation marks omitted). Although Provost Curran was not the final decision maker, the record reveals that she echoed the recommendations made by previous reviewers: "I know that Dr. Frederick compares herself to [the male faculty members]. I did not compare their dossiers to each other, nor to hers, in my review." Aplt. App. at 203. She described both men as

- 15 -

"unusual in their contributions, verging on outstanding.  Taking them out of the picture, Dr. Frederick still did not meet the standard for promotion to Professor.  It really was not even a close call in my mind."  *Id*.

The judgment of the district court is affirmed.

Entered for the Court


Bobby R. Baldock
Circuit Judge