**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 31, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PATRICK CILLO; INTERNATIONAL UNION
OF POLICE ASSOCIATIONS, AFL-CIO,
("IUPA"),

      Plaintiff  - Appellant,

v.

No. 12-1395

CITY OF GREENWOOD VILLAGE, a body
corporate and politic; DONNIE PERRY, in his
individual capacity; JOSEPH HARVEY, in his
individual capacity; JAMES SANDERSON, in
his individual capacity,

      Defendants - Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-03116-MSK-MJW)**

John A. Culver (Seth J. Benezra and Sarah J. Parady, with him on the briefs), Benezra &
Culver, P.C., Lakewood, Colorado, appearing for Appellants.

Jennifer F. Kemp (Eric M. Ziporin, with her on the brief), Senter Goldfarb & Rice, LLC,
appearing for Appellees.

Before **MATHESON, McKAY,** and **EBEL,** Circuit Judges.

**MATHESON**, Circuit Judge.

The City of Greenwood Village, Colorado, ("the City") fired Police Sergeant

Patrick Cillo after an incident involving officers under his command. Sgt. Cillo alleges

the City's real motive for firing him was opposition to the union chapter he led. Sgt.

Cillo and his union sued the City and three individual defendants—Police Chief Donnie

Perry, Lieutenant Joseph Harvey, and City Manager James Sanderson (collectively

"Defendants"). The district court granted summary judgment for Defendants on all

claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for

further proceedings.

## I. **BACKGROUND**

### A. *Factual History*[1]

1. **The parties and their roles**

The Greenwood Village Police Department ("GVPD") comprises about 65 law

enforcement officers.[2] At the time of the relevant events, Chief Perry, Lt. Harvey, and

three other lieutenants were the top GVPD administrators—the "Command Staff." Mr.

Sanderson was the former GVPD police chief and current City Manager. As City

Manager, he heard appeals of employee terminations and had final decision-making

authority.

---

[1] We describe the facts of this case as we must consider them at summary judgment—in the light most favorable to Sgt. Cillo and his union. *See Tabor v. Hilti*, 703 F.3d 1206, 1215 (10th Cir. 2013).

[2] This opinion uses the term "officer" generically to refer to law enforcement personnel of any rank, including rank and file police officers and commanding officers.

Sgt. Cillo, a GVPD officer for 28 years, became a sergeant in 1997. Colleagues considered him a capable leader whose employees "would follow him into a burning building." Appx., Vol. II at 411. Sgt. Cillo earned numerous honors from inside and outside the GVPD, including the Medal of Valor, the highest honor given to living officers, and 2008 Officer of the Year for the judicial district encompassing more than twenty law enforcement agencies. His consistently positive performance reviews showed ratings of commendable and outstanding. Sgt. Cillo was never formally disciplined until his 2009 termination.

Until March 2008, Sgt. Cillo held two special leadership assignments, Sergeant in Charge of the Traffic Unit and Commander of the Emergency Response Team ("ERT"). Through this work, Sgt. Cillo developed considerable expertise in traffic fatality and accident reconstruction. He often consulted with other police departments and testified in court as an expert witness. His supervisors and colleagues universally agreed that he was highly skilled and widely respected in this field, and some described him as "probably the best I know," Appx., Vol. II at 411, and "one of the best in the country," *id.* at 468.

2. **The Union and associated controversy**

a. *Formation of the Union*

Before 2007, nearly every GVPD officer belonged to the local lodge of the Fraternal Order of Police (the "FOP"), a national "police employee association that had some, but not all characteristics of a union." Appx., Vol. VI at 1489 n.11. The FOP allows officers, civilian employees, and administrators to join. It does not advocate

collective bargaining.  Chief Perry and three of his four lieutenants belonged to the FOP.

Mr. Sanderson was a former FOP member.  The FOP routinely used the GVPD email

system and internal mailboxes to announce FOP events, distribute meeting minutes, and

collect dues.  FOP representatives visited new employee orientation sessions to recruit

new members.

In 2007, Sgt. Cillo and two other officers formed Local 305, a chapter of the

International Union of Police Associations, referred to within the GVPD as "the Union."

*See* Appx., Vol. II at 257.  Sgt. Cillo served as chapter president.  Unlike the FOP, the

Union advocated collective bargaining and did not allow members of the Command Staff

to join.  The Union launched an aggressive recruiting effort that sharply criticized the

City and the Command Staff for perceived inadequate training, poor officer retention,

failures in recruiting, poor morale, low pay, and unfairness and lack of transparency in

decision making, particularly regarding promotions.

b.  *Controversy about the Union*

When the Union formed, there was "constant conversation" among GVPD officers

about whether they would join.  Appx., Vol. IV at 735.  Most officers spoke openly about

their affiliations with the Union and/or the FOP, and it was "common knowledge" in the

small department which officers joined the Union and which remained with the FOP.  *Id.*

at 730, 742, 748.  When new Union members resigned from the FOP, their names were

immediately deleted from the FOP email distribution list, allowing the remaining FOP

members to easily deduce who had switched affiliation.  No rules prevented officers from

-4-

belonging to both groups.

"[T]he division between Union and FOP members was palpable." *Id.* at 742. "[E]ach group associated mainly with other officers who were members of the same group." *Id.* Some in the department referred to the Union as the "Donnie haters," based on the Union's criticism of Chief Perry and his Command Staff. Appx., Vol. III at 580. After joining the Union, some officers felt the Command Staff became "noticeably less friendly" towards them, *id.* at 730, and they inferred that "the Union [was] a real sore spot for management," *id.* at 720. Union members suspected that one particular Union member "often told command staff about" what was discussed during closed-door Union meetings. *Id.* at 748.[3]

The Defendants deny harboring negative views of the Union. Even so, deposition testimony indicates that Mr. Sanderson, Chief Perry, and Lt. Harvey followed the Union's activities with displeasure. The individual defendants discussed the Union on numerous occasions with each another, with other members of the Command Staff, and with rank and file officers. The tone of these conversations ranged from polite disagreement with the Union's positions about collective bargaining to harsh criticism of the Union and of Sgt. Cillo. The Defendants especially disagreed with the Union's goal

---

[3] At one Union meeting, members discussed whether to endorse then-Sgt. Harvey's bid for promotion to lieutenant. Then-Sgt. Harvey was not a Union member and was not at the meeting. Yet he later confronted one Union member who had spoken against his endorsement, implying that he knew about the meeting discussion and that he believed the person was "his enemy." Appx., Vol. IV at 748.

of implementing collective bargaining.

Mr. Sanderson circulated an open letter disputing the Union's criticisms. During meetings with Command Staff, Mr. Sanderson said that if collective bargaining came into effect, officers would "start from zero" and could lose their existing benefits. Appx., Vol. II at 317. Chief Perry told the Command Staff and individual rank-and-file officers that the Union was divisive and bad for the department. He claimed that Sgt. Cillo had formed the Union as a way to get himself promoted and was taking advantage of Union members. Chief Perry insisted the FOP was a better organization. And he rejected the Union's goal of collective bargaining, saying that if the City ever agreed to bargain collectively, the employee association with the most members would control the bargaining process—which Chief Perry asserted would be the FOP, not the Union.[4]

The new Union grew quickly. Within a year, about half the department had joined, including nearly every officer in Sgt. Cillo's Traffic Unit. Many officers resigned from the FOP after joining the Union, but some remained members of both organizations.

c. *Alleged anti-Union actions by the Command Staff*

In August 2007, an anonymous letter was circulated widely throughout the GVPD, promoting the Union and criticizing the Command Staff. Lt. Harvey suspected Officer

---

[4] In his deposition, Chief Perry said he had "support[ed] collective bargaining 100 percent." Appx., Vol. III at 581. Mr. Sanderson claimed in his deposition that he had never heard that the Union favored collective bargaining. *Id.* Vol. IV at 912. These statements contradict testimony from multiple witnesses that Chief Perry and Mr. Sanderson expressed opposition to the Union's collective bargaining goals on several occasions. We must resolve these factual disputes in Sgt. Cillo's favor.

Bry Jones of being the letter's anonymous author. After the letter circulated, Officer Jones applied for a promotion to a sniper position and was considered the leading candidate based on tenure and test scores. During Officer Jones's interview, Lt. Harvey confronted him with suspicions about the letter, saying the author lacked "loyalty" to the department and should not be promoted. Appx., Vol. IV at 743, 749. Lt. Harvey also told Officer Jones's direct supervisor that if Officer Jones was the author, the GVPD should not promote him. Officer Jones denied writing the letter and informed the Command Staff that he was concerned the GVPD was withholding a promotion because of his Union affiliation. In the end, the GVPD gave him the position.

Sometime in 2008, the Union sought access to the GVPD email system, officer mailboxes, and new employee orientation meetings. Mr. Sanderson refused, even though he knew the FOP continued using these resources until after Sgt. Cillo's termination. Union members were also prohibited from recruiting officers while on duty, even as FOP recruitment continued during work hours with little or no reprisals.

In March 2008, Chief Perry and Lt. Harvey removed Sgt. Cillo from his position as head of the Traffic Unit and assigned him to lead the Detective Unit. They also stripped him of his long-term position as commander of the ERT, which reduced his income. Chief Perry and Lt. Harvey knew that Sgt. Cillo strongly opposed the move, given his expertise in accident reconstruction and his lack of experience or training in the

Detective Unit.[5]  The Defendants say this transfer was a leadership rotation, meant to benefit Sgt. Cillo's career by providing cross-training.  Sgt. Cillo and others suspected it was meant to set him up for failure—and to isolate him from Union members, as almost every officer in the Detective Unit belonged to the FOP.

\* \* \*

By the first half of 2009—just before Sgt. Cillo was fired—Union membership surpassed or was about to surpass FOP membership.  The Defendants acknowledge they were aware at the time that the organizations' membership levels "had . . . evened out" and the Union "potentially had a few more members" than the FOP.  Appx., Vol. IV at 819.  But they deny having kept "tabs on . . . the exact membership" of either organization.  Aplee. Br. at 17.

3. **The Motel 6 incident and its disciplinary fallout**

a. *The incident*

About 3:30 a.m. on June 9, 2009, GVPD officers responded to a sexual assault report at the Motel 6 in Greenwood Village.  The officers had been told the victim was at the hospital and that two suspected assailants—believed to be members of a local violent

---

[5] The Defendants dispute that Sgt. Cillo lacked training in the Detectives Unit, noting that he attended a course in Las Vegas in December 2008.  But this does not address Sgt. Cillo's assertion that he lacked training and experience in the Detective Unit in March 2008, the time of his transfer.

gang—were in Room 508.[6] The officers had credible information that one suspect usually carried a handgun, so Officer Jones retrieved a compact AR-15 rifle from his police vehicle.

Sgt. Cillo and another sergeant, David Wroblewski, were the ranking officers on the scene, but there was some confusion as to which sergeant was in charge. Both sergeants and every officer on the scene were Union members except one individual— Field Training Officer ("FTO") Matt Williams. An FTO supervises a trainee officer and has the same command responsibilities as a sergeant.

Sgt. Cillo understood that several experienced officers planned a "knock and talk" at Room 508, which meant they would attempt to gain voluntary cooperation from the suspects without using force. Appx., Vol. V at 1087-88. FTO Williams and another officer obtained pass keys from the motel management—a common precautionary step in case of exigent circumstances. Four officers, including Officer Jones, approached Room 508. FTO Williams and his trainee officer stood back, and Sgts. Cillo and Wroblewski and a detective stood about 15 to 20 feet behind them.

The officers knocked on the door and announced themselves, but heard no response. Without discussion or instruction, Officer Jones used a pass key to open the

---

[6] Some parts of the record refer to the room number as Room 528.

door.[7] The door opened a few inches but was stopped by an inside latch. FTO Williams

rushed to the door and raised his leg to kick it in. But before he made contact with the

door, one of the suspects voluntarily opened it.

Officer Jones entered the room and ordered one of the suspects to the ground.

When the suspect did not comply and began backing away, Officer Jones pressed the

muzzle of the AR-15 against the suspect's ribs to move him to the bed—a technique

taught in GVPD officer training that is referred to as a "muzzle punch." Appx., Vol. IV

at 744-45.[8]

Neither suspect was injured, and no complaints were filed about the forced entry

or use of force. Although the parties do not agree about whether Officer Jones's use of

force inside Room 508 was justified by one suspect's failure to comply with his

commands, everyone seems to agree that the entry into the room violated the Fourth

Amendment.

---

[7] The Defendants assert that Sgt. Cillo ordered the officers to "check the door," but they fail to cite to record support for this assertion. Aplee. Br. at 2. Sgt. Cillo denies this, and Lt. Harvey's investigation report said that Officer Jones acted on his own without orders when opened the door. As previously noted, we must resolve factual disputes in Sgt. Cillo's favor. *See Tabor*, 703 F.3d at 1215.

[8] The Defendants say Officer Jones used the muzzle to "strike" the suspect, but they again fail to point to record support. Aplee. Br. at 3. Lt. Harvey's investigation report and Officer Jones's affidavit both stated that Officer Jones "pressed" the muzzle to the suspect's ribs. Appx., Vol. V at 1220 (Harvey report); *id.* Vol. IV at 744-45 (Jones dep.) It is not clear the distinction is material to Sgt. Cillo's claims, but assuming it is, we must accept his version of disputed facts. *See Tabor*, 703 F.3d at 1215.

b. *The investigation and disciplinary response*

Chief Perry ordered an internal investigation of the Motel 6 incident. Lt. Harvey led the investigation and made disciplinary recommendations. This was unusual because the person who conducts an investigation does not typically recommend discipline. The other three lieutenants were left out of the disciplinary decision-making process, which was also unusual.

During the investigation, Sgt. Cillo agreed the use of force was a mistake. He told the Command Staff he had intended only for the officers to do a knock and talk. He acknowledged he had failed to closely supervise the officers, though he maintained this was partly because his view was blocked and he could see only the backs of the six or eight officers standing between him and the door. Sgt. Cillo repeatedly said he was committed to preventing similar mistakes in the future. Lt. Harvey and Sgt. Cillo discussed the need to provide officers with more training on the use of pass keys and with refresher training on Fourth Amendment practices generally.

Lt. Harvey recommended termination or formal discipline for seven of the ten employees who had been at the Motel 6.[9] Sgt. Cillo was among three employees to be fired. Two lieutenants, including Sgt. Cillo's direct supervisor, expressed disagreement with this recommendation. A third lieutenant formed no opinion because he was not

---

[9] Two officers received only verbal coaching because they were inexperienced and had followed the lead of more tenured officers. A third sergeant on the scene received no formal discipline because his involvement was minimal.

-11-

permitted to read the investigation report, but he expressed concern that the full Command Staff was not being consulted.

In spite of opposition from his Command Staff, Chief Perry adopted all of Lt. Harvey's recommendations. Three employees—all Union members—were terminated: Sgts. Cillo and Wroblewski and Officer Jones. Chief Perry concluded that Sgts. Cillo and Wroblewski had failed to effectively supervise the officers at the scene. Three employees—also Union members—were placed on decision-making leave for failure to intervene to prevent the unlawful entry. Decision-making leave was the highest level of discipline short of termination.

The only non-Union employee at the scene, FTO Williams, received a written reminder—the lowest level of formal discipline.[10] The Command Staff determined that FTO Williams was less culpable because he had relied on others at the scene and assumed they had information that justified the forced entry.

Sgt. Cillo appealed his termination to Mr. Sanderson, who denied the appeal.

---

[10] Chief Perry assigned this more lenient punishment despite FTO Williams having played a larger role in the forced entry than the officers who received decision-making leave: FTO Williams had obtained one of the pass keys and had prepared to kick in the door. Because his trainee officer was with him, his supervisory obligations were comparable to that of a sergeant.

Only one other FTO was at the scene, FTO Dave Lusk, one of the three officers given decision-making leave. In contrast to FTO Williams, FTO Lusk did not have a trainee officer with him, spent less time at the scene, and did not actively participate in the forced entry. Yet FTO Lusk, a Union member, was disciplined more harshly than FTO Williams, an FOP member who did not belong to the Union.

c.  *Chief Perry's statements after Sgt. Cillo's termination*

Soon after terminating Sgts. Cillo and Wroblewski and Officer Jones, Chief Perry held a roll call meeting to answer rumors that the three men had been fired because of their visible leadership roles in the Union.  At the meeting, Chief Perry denied the department was "targeting" Union members or trying to "break up the Union."  Appx., Vol. V at 1169.  Chief Perry discussed collective bargaining, suggesting that the Union's approach would not benefit the department because "you will lose more with collective bargaining than you will gain."  *Id.*  He told officers the City did not intend to recognize the Union, and encouraged them to learn more about the FOP.  He stated that if the City ever agreed to bargain collectively with its employees, it would deal with whichever association was larger—which Chief Perry insisted would be the FOP.

d.  *GVPD's disciplinary decisions in comparable situations*

The GVPD maintains a disciplinary system called "Discipline without Punish" ("DWP").  DWP sets a preference for responding to mistakes or misconduct with additional training rather than formal discipline.  The Command Staff considers tenure, experience, prior discipline, and acceptance of responsibility when making disciplinary decisions under DWP.

Sgt. Cillo points to similar incidents in which non-Union commanding officers failed to prevent others from committing Fourth Amendment violations but were not formally disciplined.  In 2008, three lieutenants, including Lt. Harvey, and multiple officers responded to a call from a home in the Roundtree neighborhood where a resident

-13-

was threatening suicide (the "Roundtree incident"). The officers were told not to allow the resident to go upstairs "under any circumstances." Appx., Vol. IV at 725. The lieutenants did not clarify that force should not be used. The officers entered the resident's home and shot him with a Taser and with multiple bean bag rounds to his buttocks. An hour later, more officers entered the home and repeatedly shot the resident with a Taser. Chief Perry found that the entry and force were unlawful, but no one was disciplined.

In 2009 and 2010, a sergeant failed to prevent a series of Fourth Amendment violations. He ignored a pattern of serious wrongdoing by subordinate officers, verbally berated a citizen and another officer, and illegally handcuffed and relocated a suspect while with a subordinate officer. The sergeant was not formally disciplined because he accepted responsibility and because no complaints were filed.

The foregoing examples involved supervising officers who failed to prevent subordinate officers from committing Fourth Amendment violations. Sgt. Cillo also points to examples in which supervising officers themselves committed Fourth Amendment violations. In 2008, an FTO illegally seized evidence from a private home without a warrant. The same FTO later went to a suspect's hospital room while the suspect was unconscious, where he illegally viewed the suspect's medical records and drew blood without a warrant and without consent. The FTO took all of these actions in the presence of a trainee officer. He received a written warning and lost his responsibilities as a trainer.

-14-

B. *Procedural History*

After exhausting his administrative appeal options, Sgt. Cillo and the Union filed this action against the City, Chief Perry, Lt. Harvey, and Mr. Sanderson.[11] The complaint alleged three claims: (1) a claim by both plaintiffs against all Defendants for violating their First Amendment right of free association, pursuant to 42 U.S.C. § 1983; (2) a state law claim by Sgt. Cillo against the City for discriminating against him for lawful, off-duty activities (his union association);[12] and (3) a state law claim by Sgt. Cillo against the individual defendants for tortious interference with his at-will employment contract with the City.

The Defendants moved for summary judgment, and the individual defendants asserted qualified immunity. The district court concluded that Sgt. Cillo had not shown a genuine dispute of fact as to whether his Union activity was a motivating factor in the City's decision to terminate him.[13] The court granted summary judgment to Defendants on all claims without separately analyzing the state law claims.

---

[11] The complaint also named Lieutenant Ceil Randit Corbitt as an individual defendant. In August 2011, Sgt. Cillo stipulated to the dismissal of Lt. Corbitt as a party.

[12] The second claim originally named all of the defendants, but the parties later stipulated to the dismissal of the second claim as to the individual defendants; the claim was not dismissed as to the City.

[13] As we later explain, this is the third factor in the four-part *Pickering/Connick* test, which applies to First Amendment retaliation claims by public employees. *See, e.g.*, *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

Although the district court purported to apply a qualified immunity analysis, it is not clear what standard it applied. As we understand the court's decision, it concluded there was no qualified immunity because there was no constitutional violation, and it did not reach the question of whether the constitutional right at issue was clearly established. Additionally, because the district court concluded that the individual defendants had not violated Sgt. Cillo's constitutional rights, it did not consider the separate liability standards applicable to municipalities in § 1983 cases, as articulated in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), and *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).

## II. **DISCUSSION**

The parties and the district court agree the Union's claim "necessarily stands or falls in accordance with [Sgt.] Cillo's § 1983 claim." Appx., Vol. VI at 1466, n.1. Our discussion therefore focuses on Sgt. Cillo's § 1983 First Amendment claim. *See Allee v. Medrano*, 416 U.S. 802, 820 n.13 (1974) ("[P]rotected First Amendment rights flow to unions as well as to their members and organizers.").

Sgt. Cillo argues on appeal that the district court erred in granting summary judgment because there is a genuine issue of material fact as to whether his constitutional right to associate with the Union was violated. The Defendants argue the district court correctly concluded that no reasonable jury could conclude that Sgt. Cillo's constitutional right was violated. We agree with Sgt. Cillo, and we further conclude that the constitutional right was clearly established. The individual defendants therefore were not

entitled to summary judgment based on qualified immunity.

The following discussion explains our disposition of the qualified immunity issue and our decision to reverse the district court's grant of summary judgment to the individual defendants on the § 1983 claim. Because the district court and the parties' appellate briefs fail to address the separate question of the City's liability under § 1983, we remand that issue to the district court for resolution. Because the district court granted summary judgment on the state law claims without separate analysis of those claims, we reverse and remand for further consideration.

We first review the legal rules that govern this case and then turn to our discussion of Sgt. Cillo's claims.

A. *Legal Background*

1. **Section 1983**

42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law. *Id.* This includes federal rights violations that occur in the context of public employment. *See, e.g.*, *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 741 (10th Cir. 2013) (considering § 1983 claim by public employee for alleged violation of employee's rights under various federal laws); *Montgomery v. City of Ardmore*, 365 F.3d 926, 932-33 (10th Cir. 2004) (considering § 1983 claim by public employee for alleged violation of

employee's First Amendment rights).[14]

Individual defendants named in a § 1983 action may raise a defense of qualified immunity. "'The doctrine of qualified immunity shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law.'" *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Elder v. Holloway*, 510 U.S. 510, 512 (1994)).[15] Generally, when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010);

---

[14] The requirements for liability under § 1983 are different for individual defendants, like Chief Perry, Lt. Harvey, and Mr. Sanderson than for municipal defendants, like the City. Section 1983 does not "impose liability vicariously on government bodies solely on the basis of the existence of an employer-employee relationship with" an official who acted unlawfully against the plaintiff. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). "[M]unicipal liability is limited to action . . . which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 479-80; *Butcher v. City of McAlester*, 956 F.2d 973, 977 (10th Cir. 1992) (evidence that city manager participated in "union-busting" activities, *id.* at 979, created sufficient official action to establish municipal liability).

Although Sgt. Cillo named the City in his § 1983 claim, the district court and the parties focus only on the § 1983 claim against the individual defendants without acknowledging the separate legal issues governing the City's liability. This issue is therefore not before us, and we do not address it.

[15] Qualified immunity is not available to municipal entities like the City. *See Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).

*Workman v. Jordan*, 32 F.3d 475, 479 (10th Cir. 1994).[16]

2. **First Amendment and association with labor unions**

"The First Amendment protects the right of a public employee to join and participate in a labor union." *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1438 (10th Cir. 1990); *see also Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464-65 (1979); *Butcher*, 956 F.2d at 979. Although "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union," the employer may not retaliate against an employee for engaging in union activity, including "threat[ening] reprisal or force." *NLRB v. Gissell Packing Co.*, 395 U.S. 575, 618 (1969).

Public employee claims for retaliation based on protected First Amendment activity are subject to a four-part test derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). *See, e.g.*, *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). The *Pickering*/*Connick* test requires the plaintiff to establish three factors: (1) his First Amendment activity involved a matter of public concern; (2) his interests in the protected activity outweighed the employer's interest in regulating it; and (3) the protected activity was a substantial motivating factor in the employer's decision to take adverse action against him. *Maestas v. Segura*, 416

---

[16] As we later explain, there is little question the right at issue in this case was clearly established. We held in 1990 that "[t]he unconstitutionality of retaliating against an employee for participating in a union was clearly established" as of 1985. *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 (10th Cir. 1990).

F.3d 1182, 1187 (10th Cir. 2005).[17] "If the employee establishes these three factors, he wins unless (4) the employer establishes it would have taken the same action in the absence of the protected [activity]." *Id.*

## B. *Standard of Review*

We review a district court's grant of summary judgment de novo, using the same standard applied by the district court pursuant to Fed. R. Civ. P. 56(a). *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013); *Montgomery v. City of Ardmore*, 365 F.3d 926, 934-35 (10th Cir. 2004). We must "view facts in the light most favorable to" the non-moving parties, Sgt. Cillo and the Union, resolving all factual disputes and reasonable inferences in their favor. *Tabor*, 703 F.3d at 1215; *see also Copelin-Brown v. New Mexico State Personnel Office*, 399 F.3d 1248, 1252-53 (10th Cir. 2005). Summary judgment must be granted if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Copelin-Brown*, 399 F.3d at 1253.

"A fact is material if, under the governing law, it could [affect] the outcome of the lawsuit." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir.

---

[17] The *Pickering*/*Connick* test has most often been applied to retaliation claims involving speech. *E.g.*, *Gardetto*, 100 F.3d at 811; *Butcher*, 956 F.2d at 979. It is not clear whether the first factor applies to retaliation claims involving union association, particularly where there is not a collective bargaining agreement in place. *See Shrum v. City of Coweta*, 449 F.3d 1132, 1138 (10th Cir. 2006). We need not resolve this legal question, however. As we later explain, Defendants do not challenge the district court's holding that Sgt. Cillo's Union association involved a matter of public concern.

2000) (quotations omitted); *see also Benavidez v. City of Albuquerque*, 101 F.3d 620, 623 (10th Cir. 1996).  A factual dispute is "genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190 (quotations omitted).

We review legal questions involving qualified immunity de novo.  *Wilson v. Meeks*, 52 F.3d 1547, 1551 (10th Cir. 1995).

### C. *Analysis*

### 1. **Qualified immunity and the First Amendment claim**

As discussed above, the individual defendants have asserted qualified immunity from suit under § 1983.  Thus, to establish his First Amendment claim under § 1983 against the individual defendants, Sgt. Cillo must show (1) at least a genuine issue of material fact as to whether the individual defendants violated his First Amendment right to associate with the Union, and (2) this right was clearly established at the time he was fired.[18]

Sgt. Cillo's appeal of the district court's summary judgment order turns on whether the evidence, taken in the light most favorable to him, shows that Defendants

---

[18] Although the district court resolved the claim on the first requirement without reaching the second, it did acknowledge that this circuit held unambiguously in 1990 that retaliating against a public employee for participating in a union is a violation of a clearly established constitutional right.  Appx., Vol. VI at 1472; *see Morfin*, 906 F.2d at 1438-39 (right to participate in a union is a clearly established constitutional right); *see also Smith*, 441 U.S. at 465; *Butcher*, 956 F.2d at 978.

violated his First Amendment right to associate with a Union. As noted above, we analyze such claims under the four-part *Pickering*/*Connick* test. The first and second factors of this test are not at issue: Defendants do not challenge the district court's conclusion that Sgt. Cillo meets the first factor—that his Union activity involved a matter of public concern—and he meets the second factor because Defendants do not claim any interest in regulating Sgt. Cillo's Union activity.

The district court granted summary judgment based on the third *Pickering*/*Connick* factor, holding that Sgt. Cillo failed to show his Union activity was a substantial factor in his termination.[19] The district court did not reach the fourth factor— Defendants' burden to show they would have taken the same action absent Sgt. Cillo's Union activity—and the parties do not address it on appeal.

    a. *Constitutional violation: Sgt. Cillo established a material dispute whether Defendants violated his First Amendment right to associate with the Union*

As discussed above, this appeal turns on the third *Pickering*/*Connick* factor. We conclude that Sgt. Cillo satisfies this factor and therefore survives summary judgment.

---

[19] In analyzing this factor, the district court employed a standard that is not supported by our precedent. Instead of relying on the well-established legal rules we have outlined earlier in this opinion—the standards governing summary judgment, the standards governing § 1983 qualified immunity, and the *Pickering*/*Connick* test governing First Amendment retaliation claims against public employers—the district court applied a "modified analytical" framework it drew from our unpublished opinion in *McCook v. Spriner Sch. Dist.*, 44 F. App'x. 896, 905-06 & n.5 (10th Cir. 2002) (unpublished). Appx., Vol. VI at 1484. This application was misplaced. We do not read *McCook* to require departure from the legal rules we have outlined, and we are satisfied these rules offer sufficient guidance and clarity to resolve this case.

The strongest evidence supporting this factor is the disparate discipline assigned to similarly-situated Union and non-Union employees involved in the Roundtree and Motel 6 incidents. Viewed in the light most favorable to Sgt. Cillo, this evidence would allow a reasonable jury to conclude that his Union activity was a substantial motivating factor in his termination. Two additional grounds support this conclusion: first, the temporal proximity between his termination and the tipping point when Union membership was expected to exceed FOP membership; and second, background facts indicating that Defendants previously disfavored Union affiliation when making employment decisions. We discuss each of these grounds below.

i. <u>Disparate treatment of similarly-situated employees</u>

When an employer disciplines an employee who has engaged in protected activity more harshly than it treats similarly situated employees who commit comparable or more serious offenses, an inference of improper motive may be drawn. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). Sgt. Cillo points to several instances in which similarly situated non-Union employees received less serious discipline than he did for comparable or more serious offenses.

(1) *The Roundtree incident compared with the Motel 6 incident*

The incidents at Roundtree and the Motel 6 were strikingly similar. In both cases, Chief Perry found officers committed an unlawful entry and used unlawful force. In both cases, ranking officers at the scene failed to prevent these violations. But in spite of this, Chief Perry chose not to discipline the Roundtree leadership team. In contrast, he fired

-23-

the Motel 6 leadership team for essentially the same mistake. A reasonable jury could find that the disparate punishments were motivated by the fact that the three lieutenants at Roundtree were all current or former FOP members, while the two sergeants in charge at the Motel 6 were Union members.

The Defendants argue that the ranking officers at Roundtree were less culpable because they merely miscommunicated, while Sgts. Cillo and Wroblewski failed to act. Even accepting these characterizations, it is not clear why poorly communicated orders at Roundtree warranted no discipline while insufficient orders at Motel 6 warranted termination. Moreover, both failures can be easily and equally characterized as miscommunication or inaction. At Roundtree, officers misunderstood their orders in part because ranking officers failed to clarify that force should not be used (a miscommunication); later, the lieutenants failed to stop the officers from repeating the forced entry and unlawful force (inaction). At Motel 6, officers misunderstood Sgt. Cillo's intended plan to do a knock and talk in part because neither he nor Sgt. Wroblewski clarified that forced entry was not warranted (a miscommunication); subsequently, the sergeants failed to intervene to stop the forced entry (inaction).[20]

_____

[20] The Roundtree incident was arguably more serious than the Motel 6 incident: the Roundtree resident was not suspected of any violent crime, the unlawful force was repeated, and the degree of force was greater. Additionally, the violations at the Roundtree home occurred over an extended period, whereas Officer Jones's forced entry at the Motel 6 happened very rapidly. Thus, the ranking officers at Roundtree had more opportunity to prevent the repeated violations. Finally, the ranking officers at the Roundtree scene were more senior than those at the Motel 6.

-24-

The Defendants also argue that they are entitled to make discretionary business decisions involving officer discipline, and we agree. This court's function is not to "second guess business decisions made by employers," and our inquiry is not whether Defendants' decision to fire Sgt. Cillo was ultimately correct or wise. *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1427 (10th Cir. 1993). Rather, we ask whether there is "some evidence of impermissible motives"—in this case, retaliation for Union activity. *Id.* Motivation is a question of fact. *See Langley v. Adams Cnty.*, 987 F.2d 1473, 1479 (10th Cir. 1993). And the circumstances of this case present a genuine question as to whether an impermissible motive was a substantial factor in Sgt. Cillo's termination.

### (2) *Discipline of Union and non-Union employees after the Motel 6 incident*

The discipline assigned to Union and non-Union employees at the Motel 6 incident is also troubling. The sole non-Union member at the scene, FTO Williams, played a more active role in the unlawful entry than did several Union members who received a more severe punishment, including Sgt. Cillo. Defendants explain that FTO Williams was less culpable because he assumed the other officers at the scene had a valid reason for the forced entry. But it is not clear why the same reasoning does not apply equally to the three Union members who were placed on decision-making leave—officers who did not attempt to kick in the door as FTO Williams did.

The Defendants claim their disciplinary actions after the Motel 6 incident could not have been motivated by Union affiliation because Chief Perry and Lt. Harvey denied

-25-

knowing that FTO Williams was non-Union. But a reasonable jury could infer from evidence in the record that Defendants knew his affiliation: Multiple witnesses said that officers' Union or FOP affiliation was a matter of common knowledge at the GVPD; the individual defendants had made statements indicating they knew the Union affiliation of numerous individuals; the individual defendants had ties to the FOP; FTO Williams was known as an active FOP member who often recruited new officers; and Sgt. Cillo points to evidence that Lt. Harvey had a close professional relationship with FTO Williams.

(3) *Additional examples of disparate discipline*

Sgt. Cillo's other examples of lighter discipline for non-Union members reinforce his assertion that discipline against Union members after the Motel 6 incident was inexplicably harsh.

First, the sergeant who failed to prevent multiple Fourth Amendment violations throughout 2009 and 2010 escaped formal discipline because he accepted responsibility and because no complaints were filed. Yet Sgt. Cillo was fired for a *single* failure during the same timeframe, even though he also accepted responsibility and there were similarly no complaints filed concerning the Motel 6 incident.

Second, an FTO received only a written warning in 2008 after he unlawfully seized evidence from a home, unlawfully viewed a suspect's private medical records, and unlawfully drew blood from an unconscious suspect without a warrant or consent—all in the presence of a subordinate trainee officer. This lenient punishment given to a non-Union employee is difficult to square with Defendants' decision the following year to fire

or suspend several Union employees for the same category of violation.

*     *     *

The disparate treatment of Union and (at least) similarly situated non-Union employees raises a genuine factual issue about Defendants' motivation for firing Sgt. Cillo.

### ii. Evidence reinforcing a reasonable inference that Union activity was a substantial motivating factor

#### (1) *Temporal proximity*

A reasonable jury could find support for improper motivation in the close temporal proximity of Sgt. Cillo's termination to a critical milestone in the Union's growth—the point at which Union membership surpassed or was about to surpass FOP membership.

The Union was a vocal and relentless critic of the City and the Command Staff. The Command Staff was associated with the FOP and had expressed opposition to the Union.  It is reasonable to infer that this tipping point in the Union's growth would be perceived within the GVPD as a victory for the Union and a setback to the Command Staff.  The Union also advocated collective bargaining, which Defendants opposed. Chief Perry opined that the Union lacked influence to achieve its collective bargaining goals as long as it was smaller than the FOP.

Sgt. Cillo was the Union president and a popular and well-respected sergeant at the GVPD.  The Union's rapid growth and the fact that all or nearly all the officers in his former traffic department joined the Union suggest Sgt. Cillo was an effective recruiter.

-27-

Chief Perry's statement that Sgt. Cillo started the Union for selfish reasons indicates the Command Staff viewed him as a principal leader of the Union's efforts.

In light of the foregoing evidence and the temporal proximity between the Motel 6 incident and the tipping point in Union/FOP membership levels, a reasonable jury could conclude that (1) Defendants deliberately overreacted to Sgt. Cillo's mistakes at the Motel 6 because of his Union association, and (2) they wanted to remove his influence at GVPD and stem the Union's growth.

(2) *Background facts suggesting past anti-Union actions*

Finally, a reasonable jury could find that Defendants had previously singled out Union members, including Sgt. Cillo, for unfavorable treatment. Taken with the other evidence, the following examples further support an inference that Defendants extended this practice by using the Motel 6 incident as pretext to fire the Union's ringleader, Sgt. Cillo.

First, Lt. Harvey explicitly opposed Officer Jones's promotion on the basis of a suspicion that Officer Jones had advocated for the Union by writing the anonymous letter. Defendants argue that Lt. Harvey was merely concerned that Officer Jones was unhappy and might leave GVPD. Perhaps this is so, but a reasonable jury could reject this explanation. Two witnesses quote Lt. Harvey as saying the anonymous letter writer lacked "loyalty" to the department. Appx., Vol. IV at 743, 794. Neither witness seemed to understand this to be an expression of concern for Officer Jones's job satisfaction.

Second, the decision to transfer Sgt. Cillo from the Traffic Unit could be construed

-28-

as disfavored treatment. Given Sgt. Cillo's strengths and reputation in the field of accident reconstruction, the decision to move him to a department where he lacked experience and training is puzzling. Defendants' explanation that they meant to help Sgt. Cillo's career through cross-training is plausible, but it is undermined by Sgt. Cillo's strong opposition to the change. And the transfer isolated him from Union members by moving him from a department dominated by the Union to one dominated by the FOP, which tends to support the inference that his Union activity was a factor in the decision.

The Defendants contend the Command Staff had discretion to decide which staffing arrangements make the most business sense. But this discretion does not extend to deliberately interfering with an employee's union activity. The question is whether the circumstances of Sgt. Cillo's transfer support a reasonable inference that Defendants made employment decisions based on impermissible motives. This is a question of fact that is genuinely disputed.

Third and finally, Chief Perry's statements at the roll call meeting could reasonably imply a connection between Sgt. Cillo's Union activity and his termination. In a discussion at the meeting about Sgt. Cillo's termination, Chief Perry expressed negative views about the Union and advocated for the FOP. He denounced the Union's collective bargaining efforts and predicted that the FOP would be larger than the Union in the future. The Defendants argue that Chief Perry was merely responding to rumors that GVPD fired Sgt. Cillo to undermine the Union. This explanation is certainly reasonable. But a reasonable jury could infer a different meaning from Chief Perry's remarks: that he

-29-

believed Sgt. Cillo's termination would undermine the Union's influence and strengthen the FOP.

Moreover, this event undercuts Defendants' assertions that they were not particularly concerned about Union activity and did not pay much attention to the Union's membership levels. Chief Perry's statements indicate that he followed the Union's activities and closely associated Sgt. Cillo with those activities. The rumors among GVPD officers that Defendants were targeting Union leaders also support Sgt. Cillo's assertions that Defendants had openly opposed the Union.

*     *     *

For the above reasons, we hold that Sgt. Cillo has raised a disputed issue of material fact as to whether his Union association was a substantial factor in Defendants' decision to fire him, which satisfies the third *Pickering*/*Connick* factor. We therefore reverse the district court's grant of summary judgment on this ground.[21]

b.  *Clearly established right*

We also hold that the individual defendants are not entitled to summary judgment based on the second requirement for § 1983 qualified immunity because Sgt. Cillo's First Amendment right to associate with a Union was a clearly established right at the time of

---

[21] As noted above, the district court and the parties agree that the Union's § 1983 First Amendment claim "necessarily stands or falls" with Sgt. Cillo's § 1983 claim. Appx., Vol. VI at 1466 n.1; *see also Allee v. Medrano*, 416 U.S. 802, 820 (1974) ("[P]rotected First Amendment rights flow to unions as well as to their members and organizers."). Thus, our reversal of summary judgment on Sgt. Cillo's § 1983 First Amendment claim applies to the Union's claim as well.

his termination. *Morfin*, 906 F.2d at 1438-39; *see also Smith*, 441 U.S. at 465; *Butcher*, 956 F.2d at 978.

*     *     *

In summary, we conclude that Sgt. Cillo survives summary judgment as to the first three *Pickering*/*Connick* factors and that the individual defendants are not entitled to summary judgment on qualified immunity grounds. As discussed above, the district court did not reach the fourth *Pickering*/*Connick* factor, and Defendants do not address it on appeal. On remand, the district court should determine (1) whether Defendants have waived the fourth *Pickering*/*Connick* factor; and, assuming they have not, (2) whether Defendants satisfy their summary judgment burden as to this fourth factor—namely, that the evidence viewed in light most favorable to Sgt. Cillo shows they would have fired him absent his Union activity.

## 2. **Remaining claims**

Having reversed the district court's grant of summary judgment as to the § 1983 claim against the individual defendants, we turn to the remaining claims—(1) the § 1983 claim against the City; (2) the state law claim against the City for discrimination against Sgt. Cillo for lawful off-duty activities; and (3) the state law claim against the individual defendants for tortious interference with Sgt. Cillo's at-will employment contract with the City.

The district court granted summary judgment on these three remaining claims based solely on its § 1983 analysis as to the individual defendants and its holding that no

reasonable jury could find that the individual defendants fired Sgt. Cillo because of his Union activity. Because we have determined that this conclusion was erroneous, we must also reverse as to the remaining claims and remand for further consideration consistent with this opinion.[22]

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's summary judgment order as to all three of Sgt. Cillo's claims and remand for further proceedings.

---

[22] Our reversal on the § 1983 claim against the City revives a critical question the district court must address on remand: whether the City may be held liable for Sgt. Cillo's First Amendment claim under § 1983. *See Pembaur*, 475 U.S. at 483; *Butcher*, 956 F.2d at 977.